Argued March 6; affirmed July 16, 1935

# HILL *v.* DOERFLER ET AL.
### (47 P. (2d) 260)

*William P. Ellis,* of Salem, for appellant.

*John H. Carson,* of Salem (Carson & Carson, of Salem, on the brief), for respondent.

ROSSMAN, J. In 1926, Frank A. Doerfler and Daniel J. Fry, Jr., who, together with their wives, are the defendants in this suit, purchased from one C. J. Ramsden a tract of land in Marion county containing a little less than 100 acres at a price of $9,000. The full purchase price was not paid at that time and all of it had not been paid in August, 1930, when Doerfler and Fry, as we shall later see, sold 20 acres of the tract to the plaintiffs in this suit. Immediately after contracting to make the purchase Doerfler and Fry planted a substantial portion of the tract in filbert trees.

August 15, 1930, the Hills, who had never been in Oregon before, came to Marion county and sought the

purchase of a small farm. Ernest C. Hill was born June 17, 1864, upon a farm, leaving at the age of 18 or 19 years to pursue the occupation of carpenter and millwright. In later years he owned and operated for five years a farm in the state of Maine. Doerfler, in August of 1930, was employed by the First National Bank of Salem as farm adviser. The Hills, after having inspected several farms shown to them by real estate agents, sought Doerfler's advice concerning two of them which had made favorable impressions. Acting upon his advice, they declined to purchase these farms. Later, Doerfler showed them the tract with which we are now concerned. This occurred August 26, 1930. It was a 20-acre portion of the property which Doerfler and Fry had purchased from Ramsden. About half of it contained a growth of filbert trees which were then four years old and which would not mature until they reached the age of 10 years. After Doerfler and Mr. and Mrs. Hill had been upon the property and the Hills had returned to their hotel, they again met Doerfler and then agreed to purchase the tract. At that time a written memorandum of their agreement was signed by Doerfler and Hill. In it the Hills agreed to buy the 20-acre tract at the price of $4,000, $1,000 payable immediately and the balance in annual installments of $500 each. Five per cent interest was payable upon unpaid balances. At that time Hill gave to Doerfler a check for $100, payable after the Hills' money on deposit in an eastern bank had been transferred to the First National Bank of Salem. The next day, upon Doerfler's invitation, the Hills took up their abode in his home, which was adjacent to the tract which the Hills had just contracted to purchase. They remained there for three days in sole occupancy during the Doerflers' absence. While there they constructed a garage upon

their tract into which they moved after the Doerflers' return. Next, they harvested the nut crop.

September 13, 1930, the Hills, Mr. and Mrs. Fry and Mr. and Mrs. Doerfler signed the contract with which we are now concerned. It is merely an elaboration of the informal contract of sale to which reference has already been made. One of its provisions states: "The vendors will, upon payment to them of all sums of money herein required to be paid, make, execute and deliver to the purchasers a good and sufficient warranty deed conveying a good and merchantable title in fee simple to said premises." Another of its provisions is: "The purchasers shall be entitled to the possession of said premises from the date hereof."

About September 13, 1930, Hill dug a basement for the house which he then proceeded to construct. As he dug the basement he encountered much stone. The house and the outbuildings which he constructed cost $1,616. In this suit the plaintiffs seek the recovery of that sum, together with the $1,000 paid upon the purchase price. As already noted, they also seek rescission of the contract. The complaint avers: "Promptly following the execution of said contract these plaintiffs went into possession of said described premises and are now in possession thereof."

The Hills contend that on April 9, 1932, they elected to rescind the contract of purchase and so notified the defendants. The contention is made that the Hills were justified in rescinding for the following alleged reasons: (1) Misrepresentations made by Doerfler which, it is said, influenced the Hills to purchase the property; (2) a claim of ownership by Mrs. Lydia Althoff of a small portion of the 20-acre tract; and (3) the construction by Marion county, after condemnation of the right of way, of a road across one end of the 20-acre tract.

According to the complaint, Doerfler made the following representations preceding the sale, and further, according to the complaint, each of the representations was untrue: (1) He had no land for sale and was acting solely in the capacity of farm adviser of the aforementioned bank for the purpose of assisting the plaintiffs; (2) the bank held a mortgage on this 20-acre tract and by reason of that circumstance the land's vendor could give the plaintiffs terms of purchase more favorable than would otherwise have been possible; (3) the land was worth $4,000; (4) all of the rocks on the tract were upon a half-acre portion which Doerfler had called to the plaintiff's attention; (5) the vendors possessed a merchantable title; and (6) the soil of this tract was tillable and would produce a sufficient yield to enable the plaintiffs to pay the $500 annual installment, discharge the taxes and meet their living expenses.

We are satisfied, in harmony with the plaintiffs' contentions, that a rescission is allowable in suits of this character, even for honest misrepresentations: *Sharkey v. Burlingame Co.*, 131 Or. 185 (282 P. 546); Williston on Contracts, § 1500. The testimony which the plaintiffs produced in support of their charges of misrepresentations was met by proof produced by the defendants. The defendants deny that any of the alleged representations was made except the third concerning the value of the property. The defendants admit that a representation that the property was worth $4,000 was made, and in the circuit court substantiated their contention that the property was worth that sum with evidence.

We shall now consider plaintiffs' contentions concerning the alleged misrepresentations. A few months before Doerfler and Fry sold this 20-acre tract

to the Hills they sold another 20-acre tract to one W. W. Chadwick who, as a witness, testified that, although his tract was no better than the one purchased by the plaintiffs, he paid $300 an acre for it and was satisfied with his purchase. The land from which the Hill 20-acre tract was carved was purchased by Doerfler and Fry at a price of about $100 an acre. Subsequently they planted the filbert trees at an expense of $40 an acre. The care bestowed upon them, together with incidentals, cost $50 or $60 more an acre, according to Doerfler. The latter, who claimed familiarity with the subject, testified that this land is exceptionally well adapted to filbert culture. Witnesses called by the Hills, however, testified that the value of the land was not more than $80 an acre. Our consideration of the evidence induces us to believe that the land was worth $200 an acre at the time of the sale, although it is altogether likely that the general decline in real estate values caused the value of this property to shrink. Concerning the other subdivisions of the charge of misrepresentation, we deem it unnecessary to set forth a review of the evidence. Fry did not see either of the Hills before they made their purchase nor for some time thereafter. No communications of any kind were exchanged between them before the sale. Doerfler denied that he had made any of the representations averred in the complaint except the one concerning value. It will be recalled that the Hills visited the property before they signed the memorandum contract, and that they lived in Doerfler's house, during his absence, for three days. In the meantime, they had not actually parted with a cent. It seems to us that these advantages afforded the Hills unusually good opportunities for examining the property and determining whether it was adapted to their needs. Before they signed the formal contract of purchase they

had harvested a part, at least, of the nut crop and thus acquired additional information concerning the investment they were making. Hill accompanied the surveyor who, prior to the execution of the formal contract of sale, ran out the boundary lines, and thus in going over the property could observe for himself the rock situation. The judge who presided over the trial in the circuit court had not only the benefit of seeing and hearing the witnesses but also availed himself of a visit to the land.

Having read carefully the transcript of evidence, and having examined the exhibits, we express our belief that a preponderance of the evidence does not sustain the charges of misrepresentation. We add, however, an expression of our belief that much of the Hills' disappointment with their investment is apparently due to the fact that they made an investment which was poorly adapted to their needs, and that they bought on a declining real estate market. The purchase of a four-year-old filbert orchard was poorly adapted to the needs of these elderly people. Their neglect, whatever may have been the reason for it, to follow Doerfler's advice and obtain some cows and chickens and cultivate the several acres outside of the orchard tract, accounts, in part at least, for the failure of their investment to return the desired yield. The Hills knew better than any one else their wants, and, having exercised their judgment, we cannot relieve them from the results.

■■ Next, the plaintiffs contend that the claim of ownership made by the aforementioned Mrs. Althoff to a narrow slice of the north end of the 20-acre tract authorized the Hills to rescind the contract of purchase. The following is a brief statement of the circumstances: In September, 1930, before the contract, which was signed on September 13, 1930, was prepared, a surveyor

marked the boundary lines of the 20-acre tract. The north boundary line went a few feet beyond an old fence which Mrs. Althoff (whose property adjoins the 20-acre tract on the north) apparently believed constituted the boundary line between her property and this tract. She testified that the old fence had been there for more than 21 years and that her predecessors and her tenants had cultivated the soil up to the fence. After the surveyor had run the lines, the old fence was demolished and Hill set posts for a new fence upon the surveyor's lines. While Mrs. Althoff testified that she claimed the strip between the old and the new fences, she admitted that she had never had the property surveyed, and said, "If it comes down to it I will have it surveyed if I have to." Hill testified that Mrs. Althoff had made to him no claim to the ownership of the intervening strip. We now add that the Hills were in default April 9, 1932, when they undertook to rescind the contract. One thousand dollars is all they ever paid upon their contract obligation. They have paid none of the $500 installments, have paid no interest and no taxes, but, as the complaint alleges, they retain possession.

In *Ward v. James,* 84 Or. 375 (164 P. 370, 372), the principle is stated and applied that it is sufficient if the vendor have good title when the vendee, by payment or tender of the purchase money, demands the conveyance. We quote from the decision: "It is sufficient if he has a good title at the time when the conveyance is to be made, and the objection that he had none when the contract was made will be unavailing." See also 27 R. C. L., p. 517, § 245. We quote further from *Ward v. James,* supra: "A purchaser in possession is estopped from denying the title of the vendor." In the following two decisions also we applied the principle that a vendee in possession who has not tendered per-

formance cannot question his vendor's title: *Sheehan v. McKinstry,* 105 Or. 473 (210 P. 167), 34 A. L. R. 1315 (Ann.) ; and *Frink v. Thomas,* 20 Or. 265 (25 P. 717, 12 L. R. A. 239). See also 27 R. C. L., Vendor and Purchaser, p. 543, § 278. It is evident that Mrs. Althoff's claim, if such it may be called, to the narrow strip can not now afford a basis for the desired rescission.

■ After the contract of purchase had been signed and while the Hills were in possession of the property Marion county, through the exercise of its power of eminent domain, acquired a 50-foot right of way across the south end of the tract and then constructed there a public road, which cuts off from the main portion of the farm an area aggregating an acre and a half. The plaintiffs contend that the portion just mentioned together with the land embraced in the right of way constituted the most fertile soil in the tract and that these developments have rendered the property unsuitable for the purposes for which it was purchased. They also direct attention to the fact that the defendants can not now convey title to the entire tract. In support of this contention that the developments just mentioned authorize a rescission of the contract, the plaintiffs cite *Lombard v. Kies,* 79 Or. 355 (154 P. 757), and the annotation appearing in 59 A. L. R. 246. In *Lombard v. Kies* the defendant granted, in consideration of $1,000 paid to him by one Malpas, an option to purchase the tract of land described in the option instrument. During the option period Kies agreed to conduct the appropriate proceeding to perfect his title to the land. In the event he succeeded, Malpas could purchase or not as he saw fit, but in the event he failed, Kies agreed to return the sum paid for the option. Later, the plaintiff acquired the option. Our statement that the instrument was an option is warranted not only by the nature

of the instrument (it is quoted in the decision) but also by the following excerpt taken from the decision: "It is obvious from an examination of the writing that the agreement is nothing more or less than a unilateral option to buy in which the vendee may or may not at his own pleasure make the payments specified therein." The writing was dated June 28, 1912. According to the statement preceding the decision, "on April 5, 1912, after the necessary preliminaries had been observed, the county court of Washington county made and entered an order establishing a county road" across the tract of land. The parties were unaware of these proceedings and upon plaintiff's (optionee's) discovery of the road-building operations, he instituted a suit to rescind "the contract and recover the payments made thereon, alleging two breaches thereof", one of which was the establishment of the road. From a decree in his favor, which, however, awarded no money judgment, the defendant appealed. In sustaining the decree, this court said: "The inevitable logic of this deduction is that, if the establishment of the highway is unknown to the contracting parties, the question of its effect upon the agreement depends upon the facts of the individual case, especially in a suit to rescind; for, if the prospective highway renders the premises unsuitable for the purpose intended by the vendee, the discovery thereof presents a condition which was not in the contemplation of the parties, and the vendee ought not to be compelled to purchase something different from that for which he bargained." It will be observed, however, that the instrument before the court was "nothing more or less than a unilateral option to buy". A rescission was unnecessary. The only real issue in the cause was whether the road construction entitled the optionee to a return of the money paid for the option. It will be

noticed that before the option was granted the county had "entered an order establishing the county road". Before bestowing further attention upon the quoted language, we shall take note of other principles of law.

In this state, as well as in most others, through the application of the equitable principle that that is deemed done which eventually must be done, the vendee, in executory contracts for the purchase of real property, is deemed owner of the property, especially if he is in possession. The relationship between the parties is regarded as analogous to that of mortgagor and mortgagee. The vendor holds the legal title in trust for the vendee and as security for the unpaid purchase money. Decisions in which the principles just mentioned are stated and applied are *Stewart v. Mann,* 85 Or. 68 (165 P. 590, 165 P. 1169); *Waller v. City of New York Insurance Co.,* 84 Or. 284 (164 P. 959, Ann. Cas. 1918C, 139); *Davis v. Wilson,* 55 Or. 403 (106 P. 795). For a discussion, see Williston on Contracts, §§ 927 and 929. Due to the fact that the purchaser is deemed in equity the owner and, as owner, obtains the benefit of any fortuitous circumstances that are beneficial to the land, many courts · hold that he must also bear any accidental losses. In other words, the risks are generally thrown upon the purchaser. See Williston on Contracts, § 928, and 27 R. C. L., p. 555, § 293.

In *Summers v. Midland Co.,* 167 Minn. 453 (209 N. W. 323, 46 A. L. R. 816), the principles just mentioned were applied in a suit in which the controlling facts were not unlike those before us. In that case, while the plaintiff's contract for the purchase of a city lot was executory, the municipality condemned an easement over the lot restricting its use to residential purposes only. The plaintiff's purpose to erect upon the lot an automobile

filling station was thereby frustrated. The court held that this development did not authorize a rescission. We quote from the decision: ''We must assume that the parties make such contract in contemplation that the sovereign power of the state may intervene and substitute value for a part of the land. No person is presumed to covenant against the acts of sovereignty. The vendee takes the equitable title, subject to the exercise of the right of eminent domain, just as though the title has been conveyed to him. The taking of land in condemnation proceedings is in a legal sense a purchase and sale and the vendee in the contract, being the equitable owner, must be considered as the vendor in such forced sale. In theory at least such forced sale provides full compensation. He then should receive the award. The vendee being the equitable owner, what the sovereign takes under the power of eminent domain belongs to the vendee and not to the vendor. If the security of the vendor is impaired by reason thereof his rights must be protected and if the vendor should receive the award he must hold it as trustee for the vendee. On principle the vendee does not suffer any loss upon our theory of the law, because in condemnation any damage is fully compensated. If the vendor's security is not impaired he is not interested at all the sovereign act—that is something that concerns the vendee who is for all practical purposes, the owner. So considered the matter is simple. * * * Because of the general use of contracts for deeds in the sale of real estate often covering long periods of time and the quite frequent and perhaps growing use of eminent domain which variously affects real estate, we think our conclusion is more practical and less productive of litigation in contradistinction of the contrary view. Hardship which is highly improbable

under our construction is, we believe, quite probable under the contrary view.''

In *Reife v. Osmers*, 252 N. Y. 320 (169 N. E. 399, 67 A. L. R. 1101), after the signing of a contract for the conveyance of a 60 by 100 foot lot, but before delivery of the deed, the municipality, by the exercise of its power of eminent domain, acquired a portion of the lot 3 feet wide by 100 feet long. The purchaser thereupon sued for the return of the sums he had paid. In holding that he could not recover, the court declared that the risk of taking by condemnation, like the risk of loss by fire, is borne by the purchaser. In *Security Company v. Rice*, 215 Cal. 263 (9 P. (2d) 817, 82 A. L. R. 1059), the court declared: ''The universal rule appears to be that, where property is purchased which is subject to pending condemnation proceedings, and the deed conveying said property is silent as to the award money to be paid in the proceedings, said money belongs to and is payable to the purchaser.''

The decision most frequently cited, as authority for the proposition that a taking of a part of the property by condemnation before the delivery of the deed absolves the purchaser from his duty to accept the deed, is *Kares v. Covell*, 180 Mass. 206 (62 N. E. 244, 91 Am. St. Rep. 271). In that case the court held that when a part or all of the property described in a contract of purchase is taken by condemnation proceedings the purchaser is released from his obligation to accept any part of it. He may thereupon rescind or take the part that remains and hold his vendor liable in damages for failure to convey all. The court found no exception in the contract's covenant requiring the vendor to convey title to the entire premises and refused to read into it an implied exception in regard to takings through exercise of the right of eminent domain. It

held that the material time for determining the sufficiency of the vendor's title was not the day when the contract was signed, but the day when conveyance must be made. It is evident that the court felt that the risk that a part or all of the property might be taken by condemnation is borne not by the purchaser but by the vendor. In Massachusetts, however, according to Chief Justice Shaw, "between mortgagor and mortgagee the mortgage is to be regarded as a conveyance in fee": *Ewer v. Hobbs,* 5 Metc. 1. It is unnecessary to cite authorities in support of the statement that in Oregon a mortgage conveys no title—it merely creates a lien. The distinction between the nature of a mortgage as a conveyance in Massachusetts and its nature as a mere lien-creating agency in Oregon is, perhaps, consequential because, in Oregon, at least, an executory contract of sale is held to be quite similar to a mortgage. Since a mortgage is regarded as an instrument of conveyance in Massachusetts, it would be difficult to regard a purchaser as a mortgagor in that state. The decision in *Kares v. Covell* is, therefore, a reasonable one for a Massachusetts court.

As will be observed from the decisions reviewed in the annotations appearing in 67 A. L. R. 1104 and 46 A. L. R. 818, the majority of the courts which have passed upon the issue hold that a taking of the property by the process of eminent domain does not warrant a rescission, and does not relieve the purchaser from his contract. The majority employ the reasoning which we have already set forth. Some of the decisions dwell upon the fact that in the absence of affirmative provisions of the contract to that effect the courts will not assume that the vendor covenanted against the exercise of the power of eminent domain. Some of the decisions hold that all contracts are made

subject to the sovereign's power to take all or a part of the subject matter of the contract, and one court, at least, regards the taking as a sale by the vendee to the condemnor.

Let us now mention four of our previous decisions. In *Lombard v. Kies,* supra, the plaintiff had not contracted to buy. He was a mere optionee. The condemnation proceedings had been begun before the option was granted. In *Cavenaugh v. McLaughlin,* 38 Minn. 83, (35 N. W. 576), the condemnation proceedings were begun before the purchaser contracted to buy. That circumstance caused the court to hold that he was entitled to the return of his purchase money. Therefore, a substantial difference exists between the facts of *Lombard v. Kies* and our present facts. In *Powell v. D. S. & G. R. R. Co.,* 12 Or. 488 (8 P. 544), the facts were that a tenant by the terms of his lease bound himself to purchase, before the termination of the lease, the leased property. Before the termination of the lease the property was destroyed by a flood. The landlord then brought an action at law to recover the stipulated price of the property. The decision held he could not recover, stating that the continued existence of the subject matter of the contract was an implied condition. In *Elmore v. Stephens-Russell Co.,* 88 Or. 509 (171 P. 763), the destruction by fire of the timber upon the land which the defendant had promised to buy was held to relieve the purchaser from his promise. The decision emphasized the fact that the purchaser never had possession of the subject matter. In *Strong et al. v. Moore et al.,* 105 Or. 12 (207 P. 179, 23 A. L. R. 1217), where the relationship between the parties was that of optionor and optionee, the rule announced in *Powell v. D. S. & G. R. R. Co.* was restated. In the comment accompanying page 281, Restatement of the Law of Contracts,

the editor states: "After a contract to sell land on which there is a building, in some states and under some circumstances, the buyer is held bound to pay the price in spite of the destruction of building. Likewise, a buyer of goods who has received possession under a conditional sale, is bound to pay the price although the goods are destroyed. This is also true where a seller of goods retains a lien or a title merely for the purpose of security. These cases, however, are not exceptions to the rule stated in the section, since when recovery of the price is allowed, the result is based on the premise that the substantial incidents of ownership had already passed to the buyer before the destruction." The last sentence of the quoted paragraph seems to reconcile our previous decisions with the weight of authority and with the equitable principle that a purchaser in possession is deemed an owner. But, whether it does or not, we believe that the difference between the destruction of a substantial part of the property by flood or fire and its taking by a public body, in itself could warrant a difference in treatment by the courts. There can be no taking by a public agency or any corporation possessing the power of eminent domain without the substitution of values; in other words, there is no loss.

In the present instance, the Hills had possession of the property at the time of the taking. The parties had put into effect in a practical way the equitable principle that the purchaser is the owner and the vendor is only a mortgagee. The Hills not only had possession but also availed themselves of the yield of the land. They had no thought that any different relationship existed as is manifested by the fact that they built a dwelling house and outbuildings upon the property. When the county drew its warrant for the payment of damages

it was handed to the Hills. The impracticability of allowing a rescission because of the condemnation is emphasized when we take note of the fact that although the Hills enjoyed the privileges of ownership for two years before this suit was filed they now pray for a judgment for the value of the improvements they placed upon the land as well as the amount of purchase money received by the defendants.

The principles aforementioned which treat a purchaser in possession, under an executory contract of sale, as an owner are of frequent application in this state. No citation of authority should be needed to warrant the statement that a covenant of warranty or for quiet enjoyment is not breached when the right of eminent domain takes all or a right of the property affected by the covenant. We believe that a conclusion that the taking by Marion county did not relieve the purchasers from their contract would be in harmony with the principles of law and equity reviewed above. Without setting forth further a statement of our reasoning, we express our opinion that the taking of the road strip by Marion county did not authorize the plaintiffs to maintain this suit.

The above disposes of all contentions advanced by the plaintiffs.

The decree of the circuit court is affirmed. Neither costs nor disbursements will be allowed.

CAMPBELL, C. J., and BELT and KELLY, JJ., concur.